<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PPL ENERGYPLUS, LLC, et al., | Civil Action No.: 11-745 |
| Plaintiffs, | |
| v. | **MEMORANDUM AND ORDER** |
| LEE A SOLOMON, et al., | |
| Defendants. | |

**SHERIDAN, U.S.D.J.**

      This matter comes before the Court on a motion by defendants Lee A. Solomon, Jeanne M. Fox, Joseph L. Fiordaliso, and Nicholas V. Asselta in their official capacities as public officers of the New Jersey Board of Utilities (collectively, "Defendants") to dismiss Plaintiffs' complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6).  Plaintiffs, a consortium of utility companies and electric generator companies, seek declaratory and injunctive relief from a recently enacted New Jersey law that empowers the New Jersey Board of Utilities to set certain special guaranteed prices for wholesale electricity transactions in a market governed by the Federal Energy Regulatory Commission ("FERC").

      For the reasons stated below, Defendants motion to dismiss is denied.

## I. Facts

On January 28, 2011, the New Jersey Legislature enacted a law to foster new electric generation and provide New Jersey with new generation capacity[1] (the "Act"). N.J.S.A. 48:3-98.2 *et seq.* The law works as follows: First, the New Jersey Board of Public Utilities ("BPU") selects a limited number of electric generation companies for entry into a pilot program. The BPU bases its selections on criteria included in the Act. Second, these electric generation companies enter into irrevocable, long-term contracts with each of New Jersey's electric public utilities.[2] These contracts, or standard offer capacity agreements ("SOCAs"), guarantee the state-selected electric generation companies a fixed price for electric capacity. In exchange for the price guarantee, the Act requires the state-selected generation companies to sell the rest of their capacity in interstate electricity auctions. The SOCAs operate to insulate the state-selected generation companies from losses at auction because the SOCAs exist outside of the auction process and are regulated by the BPU. Additionally, the utility companies are insulated from

---

[1] In this context, "capacity" is similar to energy "deposits" or "reserves." Generally, "capacity" includes commitments by generators to produce electricity when electricity is needed to meet demand. Complaint, ¶ 32. Capacity is an important concept in the energy market due to the enormous deviations between maximum energy demand and minimum energy demand. *See* U.S. Dept. of Energy, *A Primer on Electric Utilities, Deregulation, and Restructuring of U.S. Electricity Markets*, at A.4 (May 2002). Additionally, utilities are required by federal regulation to maintain a certain amount of capacity. Complaint, ¶ 32.

[2] In this context, a "utility" is a company that provides electricity to the general public. *Primer*, at A.49. Traditionally, an electric utility performs three functions: (1) the generation of electricity, (2) the transmission of electricity between substations on the "bulk power system" or "power grid," and (3) the distribution of electricity from the bulk power system to retail customers (i.e., customers who use electricity rather than reselling it). *Id.* at 2.2-2.3. In the wake of electric utility deregulation and restructuring, very few utilities own enough generators to meet the full demands of their retail customers. *Id*

losses by a provision of the Act that requires the difference between the guaranteed price and the auction price to be passed to the New Jersey ratepayers. According to Defendants, new in-state electric generating facilities will not be constructed in the absence of an SOCA between an electric generating company and utility in accordance with the pilot program.

On February 9, 2011, Plaintiffs, a consortium of utility companies ("Utility Plaintiffs") and electric generator companies ("Generator Plaintiffs"), filed a complaint in this Court, alleging that the Act violates the Supremacy Clause and the Commerce Clause of the United States Constitution. Plaintiffs' main contention is that the Act violates Part II of the Federal Power Act, which provides the Federal Energy Regulatory Commission ("FERC") with exclusive jurisdiction to regulate wholesale electricity sales.[3] The Federal Power Act, ch. 285, sec. 201 (codified as amended 16 U.S.C. § 824 *et seq.*); Complaint, ¶¶ 85-97. Plaintiffs also claim that the Act regulates in favor of in-state companies at the expense of out-of state companies. *Id.*, at ¶¶ 98-112. In lieu of answering the complaint, Defendants filed a motion to dismiss under Rule 12(b)(1) and Rule 12(b)(6).

## II. Standard of Review

Defendants seek to dismiss Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and Rule 12(b)(1) for lack of Constitutional standing.

In evaluating a 12(b)(6) motion for failure to state a claim, the Court must assume that "all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Comp v.*

---

[3] "Wholesale electricity sales" involve the resale of electricity in quantity for resale purposes. *Primer*, at A.50. Likewise, "retail electricity sales" involve the sale of electricity to customers who use the energy rather than reselling it. *Id.* at A.42, A.50.

*Twombly*, 550 U.S. 544, 555 (2007).  The complaint need only "state a claim to relief that is plausible on its face," alleging no more than the "factual content" necessary to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).

In evaluating a 12(b)(1) motion challenging subject-matter jurisdiction on the basis of Constitutional standing, the Court must determine whether the challenge is facial or factual. *See Danvers Motor Co., Inc. v. Ford Motor Co.*, 186 F.Supp.2d 530, 534 (D.N.J. 2002).  A facial challenge is challenge to the contents of the pleading. *Gould Electronics v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).  When reviewing a facial challenge, the Court must review the allegations of the complaint and the documents referenced therein and attached thereto "in a light most favorable to the plaintiff," and a manner essentially the same as a 12(b)(6) motion to dismiss. *Alston v. Countrywide Fin. Corp.*, 585 F.3d 753, 758 (3d Cir. 2009).  A factual challenge is a challenge outside the scope of the complaint, allowing "a court may consider evidence outside of the pleadings." *Danvers*, 186 F.Supp.2d, at 534 (citing *Gould*, 220 F.3d at 176).  In a factual challenge, plaintiffs' allegations are not entitled to presumption of untruthfulness. *Id*.

Defendants' Rule 12(b)(1) claim is properly understood as a facial challenge.  In their moving papers, Defendants focus their standing arguments on the allegations in Plaintiffs' complaint. Defendants' Motion to Dismiss, at 8-10.  Although not parties to this action, Rate Counsel's arguments are also based on the allegations in Plaintiffs' complaint. Rate Counsel's Amicus Brief, at 5-12.  Additionally, neither Defendants nor Rate Counsel claim that Plaintiffs should be held to the higher pleading standard of a factual challenge. *See* Defendants' Motion to Dismiss, at 8 (discussing burden of allegation); Rate Counsel's Amicus Brief, at 6 (same).  Since Defendants are making a facial challenge to Plaintiffs' complaint, the standard of review for Defendants' claim Rule 12(b)(1) is identical to their Rule 12(b)(6) claim.

### III.  Analysis

A.  Standing[4]

For Article III constitutional standing, three elements must be met.  First, a plaintiff must establish that he has suffered an "injury in fact." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations omitted).  Note, however, that the extent of the injury is immaterial; a plaintiff need only show an "identifiable trifle" of harm. *Gen. Instrument Corp. of Del. v. Nu-Tek Elecs. & Mfg.*, 197 F.3d 83, 87 (3d Cir. 1999).  Second, "there must be a casual connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560.  This requirement mandates that the injury is fairly traceable to the plaintiffs' action and not the result of the independent action of a third party. *Id.*  Finally, it must be "likely" that the injury will be "redressed with a favorable decision." *Id.* at 561.

Plaintiffs' complaint makes out a sufficient argument for standing.  Regarding the injury requirement, Plaintiffs allege concrete and particularized injuries to both the Generator Plaintiffs and the Utility Plaintiffs.  The Generator Plaintiffs allege that, by artificially depressing wholesale prices for capacity and energy, the Act will cost Generator Plaintiffs millions of

---

[4] The New Jersey Division of Rate Counsel, as Amicus Curiae, also make an argument that Plaintiffs' complaint is not ripe for adjudication. Amicus Brief, at 12-15.  The crux of the Rate Division's argument is that Plaintiffs' alleged injuries may not come to pass. *Id.*  When measuring "whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry meres almost completely with standing." *Joint Stock Society v. UDV North America, Inc.,* 266 F.3d 164, 174 (3d Cir. 2001).  Thus, for the sake of judicial economy, the Rate Divisions' ripeness contentions have been folded into the standing discussion.

dollars. Complaint, ¶¶ 75-76, 81. Generator Plaintiffs base this claim on their interpretation of the energy market, that Generator-Plaintiffs' revenues depend on auction prices and the objective of the Act is to artificially lower wholesale capacity prices. *Id*. at ¶¶ 71-82.  The Utility Plaintiffs allege that the Act forces New Jersey utility companies to enter into binding, long-term contracts with state-selected generators to purchase capacity at a fixed price. *Id.* at ¶ 67.  Utility Plaintiffs further allege that these contracts, the SOCAs, force utilities to make payments to state-selected electric generating companies in an amount equal to the difference between the SOCA price and the auction clearing price. *Id.* at ¶ 67.  According to Utility Plaintiffs, even if the price difference is recouped from New Jersey ratepayers, by entering into the SOCAs, the Utility Plaintiffs must pay more to service their debt while their available credit is reduced. *Id.* at ¶ 72.  Additionally, Utility Plaintiffs' claim that the additional cost to New Jersey ratepayers will place the Utility Plaintiffs at a competitive disadvantage to energy suppliers that do not bear the cost of the subsidies. *Id.*  Regarding the traceability and redressability requirements, Plaintiffs collectively allege that the Act negatively affects capacity and energy prices by damping the competitive market, thereby causing injury, and that the requested prospective remedy will remove the harm. *Id.* at ¶¶ 6, 71-78, 85-112.

In their motion to dismiss Plaintiffs' complaint for lack of standing, Defendants contend that, since the Act has yet to be implemented, Plaintiffs have yet to be injured. Defendants' Motion to Dismiss, at 9.  Further, Defendants argue that the Act advances the ultimate goals of the FERC and that Plaintiffs' claims of future injury are inherently speculative. *Id.*.[5]  However,

---

[5] The Rate Counsel agrees with this contention. Amicus Brief, at 5-15.

the accuracy of Plaintiffs' injury claims are not at issue, and as Plaintiffs correctly note, the doctrine of standing does not require a plaintiff to wait until after they are harmed to challenge an act. *See Pacific Gas & Elec. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983); *Danvers Motor Co., Inc v. Ford Motor Co.*, 186 F.Supp.2d 530, 535-36 (D.N.J. 2002). Admittedly, some anticipatory injuries are too uncertain to provide standing. *See e.g., City of Los Angeles v. Lyons*, 461 U.S. 95, 113 (1983) (denying standing in the context of anticipatory prosecution); *Danvers*, 186 F.Supp.2d at 537-38 (denying standing where complaint equivocated on the issue of injuries). Here, however, Plaintiffs have alleged their anticipated injury with particularity, and the consequential injuries they anticipate are more than uncertain possibilities.

Defendants also content that, even assuming that Plaintiffs will be injured by the Act, Plaintiffs have failed to allege facts sufficient to satisfy the traceability requirement of Constitutional standing. Reply Brief, at 6-7. According to Defendants, the wholesale and capacity markets are affected by myriad factors, including FERC decisions, economic conditions, politics, and regulations. *Id*. Additionally, Defendants claim that the complexity of the wholesale and capacity markets prevent any party, including Plaintiffs, from pinpointing the precise effects of a given cause. *Id.* at 7. Defendants conclude that, since Plaintiffs are unable to pinpoint the precise injuries resulting from the Act as opposed to, for example, a market downturn, Defendants claim that Plaintiffs can not trace such injuries to the Act. *Id.*

The traceability element of standing requires "a casual connection between the injury and the conduct complained of" and not "the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted). There is no requirement that

7

the conduct complained of be the only cause of a given injury. *See e.g., Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals*, 913 F.2d 64, 72 n.8 (3d Cir. 1990).  To establish standing, Plaintiffs need not show that the Act is the sole cause, or even a direct cause, of the threatened injury. *See Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009). Plaintiffs must show an "indirect casual relationship" between the Act and their alleged injuries, and they have done so. Complaint, ¶¶ 6, 71-78, 85-112.

B.  Preemption Claims

The preemption doctrine is rooted in the Supremacy Clause of the United States Constitution. *See Gade v. Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 108 (1992).  "Under the Supremacy Clause, federal law may supersede state law in several different ways." *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

Plaintiffs allege that the Act is preempted because it (1) intrudes on FERC's exclusive jurisdiction to regulate wholesale electricity transactions, and (2) erects obstacles to the FERC's achievement of its regulatory goals in the wholesale electricity markets. Complaint, ¶¶ 88-89. These allegations correspond to the preemption doctrines of field preemption and preemption based on state law that impedes achievement of federal objectives. *See e.g., Chamber of Commerce v. Brown*, 554 U.S. 60 (2008) (field preemption); *Nash v. Florida Indus. Comm'n*, 389 U.S. 235 (1967) (preemption based on state law that impedes achievement of federal objectives).

Field preemption and preemption based on state law that impedes the achievement of federal objectives involve similar, but not identical, inquiries.  Field preemption exists when either "the nature of the regulated subject matter permits no other conclusion," or when

"Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963). Preemption based on state law that impedes the achievement of federal objectives exists when the state law "stands as an obstacle to the accomplishment and execution of the full purposes or objectives of Congress." *Lines v. Deviates*, 312 U.S. 52, 67 (1941). Either finding requires a determination of the record and context of the challenged state and federal laws. *See e.g., Pacific Gas & Elec. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-23 (1983); *Perez v. Campbell*, 402 U.S. 637, 644-48 (1971).

Here, Plaintiffs successfully plead both that the Act intrudes on a field that Congress intended to be the sole province of the FERC, and that the Act erects an obstacle to FERC's achievement of its regulatory goals. *See* Complaint, ¶¶ 88-89. Regarding field preemption, both Plaintiffs and Defendants agree that Congress, by enacting the F.P.A., has delegated exclusive authority to regulate the transmission and sale at wholesale of electric energy in interstate commerce. *See* Defendants' Motion to Dismiss, at 12-13; Plaintiffs' Opposition Brief, at 13. The open question is whether the Act intrudes on FERC's exclusive authority. *See* Defendants' Motion to Dismiss, at 13. In their complaint, Plaintiffs make numerous, particularized claims that the Act does intrude on FERC's exclusive authority. Complaint, ¶¶ 53, 67-71, 88 (arguing that the Act impermissibly guarantees a wholesale capacity price). Additionally, Plaintiffs successfully claim that, even if the Act does not intrude on FERC's exclusive authority, the Act impedes the FERC's policy of establishing a market-based approach to setting wholesale energy rates in the mid-Atlantic market. *Id.* at ¶¶ 31-36, 40. Thus, Plaintiffs' claims are sufficient to withstand Defendants' Rule 12(b)(6) motion to dismiss and the claims should go forward to determine the scope, context, and record of the challenged state and federal laws.

C.  Dormant Commerce Clause Claim

The Commerce Clause grants Congress the power to "regulate Commerce with foreign Nations, and among the several states . . . ." U.S. Const., Art. I, § 8, cl. 3.  The Supreme Court has long "recognized that this affirmative grant of authority to Congress also encompasses an implicit or 'dormant' limitation on the authority of the States to enact legislation affecting interstate commerce." *Healy v. Beer Institute*, 491 U.S. 324, 326 n.1 (1989).  In the Third Circuit, "[t]he party challenging the statute has the burden of proving that the statute is discriminatory." *Freeman v. Corzine*, 629 F.3d 146, 158 (3d Cir.2010) (internal quotations omitted).  In this context, discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (internal quotations omitted).

Plaintiffs advance a credible case that the intent and effect of the Act are to discriminate in favor of in-state generation at the expense of out-of-state generation.  Plaintiffs claim the state-selected electric generators disproportionately benefit from said agreements. Complaint, ¶ 103.  According to Plaintiffs, the eligibility requirements for the selection process are weighted towards in-state generators. Complaint, ¶ 102 (claiming that a commercial operation deadline favors in-state generators that are sufficiently advanced in planning and permitting), ¶ 104 (identifying pre-qualification requirements that favor in-state generators, including providing environmental, economic, and community benefits to New Jersey).  According to Plaintiffs, the eligibility preferences for in-state generators is belied by the fact that all three of the generation

facilities selected by the BPU are from New Jersey. See <u>Plaintiffs' Opposition Brief</u>, at 26 n.9. Furthermore, Plaintiffs identify portions of the legislative record that Plaintiffs claim illustrates that the intent of the Act is to favor in-state generation over out-of-state. <u>Complaint</u>, ¶ 101.

While Defendants dispute the discriminatory affect of the Act, Defendants are unable to identify any claims that are implausible on their face. See <u>Defendants' Brief in Support</u>, at 20-24. Thus, Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim fails as to Plaintiffs' Commerce Clause claim.

## IV

This Court has reviewed all submissions.  For the reasons set forth in the above Memorandum;

IT IS on this 19th day of October 2011,

ORDERED that Defendants' First Motion to Dismiss Complaint in Lieu of Filing an Answer (Docket Entry #22) is DENIED;

<i>s/Peter G. Sheridan</i><br>
PETER G. SHERIDAN, U.S.D.J.