<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PPL ENERGYPLUS, LLC, et al., | Civil Action No.: 11-745 |
| Plaintiffs, | |
| v. | |
| LEE A SOLOMON, et al., | **MEMORANDUM AND ORDER** |
| Defendants. | |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on three motions based upon preemption: Plaintiffs'
motion for summary judgment (ECF 88); a Cross-Motion for Summary Judgment by CPV Power
(ECF 98); and a motion for summary judgment by Nicholas Asselta, Joseph Fiordaliso, Jeanne Fox
and Lee Solomon (the Board of Public Utilities) (ECF 100). The Court has jurisdiction because the
issue arises out of the Federal Power Act (codified as amended 16 U.S.C. § 824 *et seq.*).

On February 9, 2011, Plaintiffs, a consortium of utility companies and electric generator
companies filed a complaint alleging that the Long-Term Capacity Agreement Pilot Program Act
(P.L. 2011, c.9, approved Jan. 28, 2011, codified at N.J.S.A. 48:3-51,48:3-98.2 to -98.4)1 ("LCAPP
Act") is preempted by the Supremacy Clause and the Commerce Clause of the United States
Constitution. Plaintiffs' main contention is that the LCAPP Act violates Part II of the Federal Power
Act, which provides the Federal Energy Regulatory Commission ("FERC") with exclusive
jurisdiction to regulate wholesale electricity sales. More particularly, the federal question is whether

1

the Board of Public Utilities of the State of New Jersey (BPU) was jurisdictionally preempted from approving two new gas fired generators of electricity pursuant to the LCAPP Act due to FERCcontrol.

<u>I.</u>

The Plaintiffs are energy related companies such as PPL Energy Plus and Calpine Energy, and some are New Jersey regulated utilities such as PSE&G and Atlantic City Electric Co. The defendants are the Commissioners of the Board of Public Utilities ("BPU"). In addition to the parties, the case focuses on the actions of two major entities – FERC and PJM Interconnection, LLC. For reasons unknown, neither entity is participating in this suit.

About forty years ago, Congress and leaders of corporate and governmental energy providers foresaw the need for utilities to purchase wholesale electric capacity.  Evidently, purchase of future energy capacity hedges against unexpected circumstances such as extreme weather or breakdown of power plants.  In this context, "capacity" is similar to energy "deposits" or "reserves."  Generally, "capacity" includes commitments by generators to produce electricity when electricity is needed to meet demand. <u>Complaint</u>, ¶ 32.  Capacity is an important concept in the energy market due to the substantial deviations between maximum energy demand and minimum energy demand. *See* U.S. Dept. of Energy, *A Primer on Electric Utilities, Deregulation, and Restructuring of U.S. Electricity Markets*, at A.4 (May 2002),  http://www1.eere.energy.gov/femp/pdfs/primer.pdf.  Additionally, utilities are required by federal regulation to maintain a certain amount of capacity. <u>Complaint</u>, ¶ 32. As explained at oral argument, generators are " interconnected into a  grid, and they generate power that goes onto the grid. And they also make their excess capacity available, so that at times of peak demand, capacity needs to be called on. It can be called on to deliver energy on the PJM grid." (T.

29, 24 through T. 30, 4).

   To accomplish this, regional wholesale electric markets were established coordinating between different states.  New Jersey is part of a regional wholesale electricity market that includes thirteen states. This market is administered by PJM Interconnection, LLC (PJM).  At oral argument, PJM was defined as "a private corporation . . .  it operates pursuant to a tariff . . .  which is filed and approved by FERC. " (T. 29, 12-24).  The FERC controls the cost of energy and wholesale capacity and some other services on the grid, which includes wholesale energy auction of PJM that is a critical part of the issue here. (T. 29, 11-16).

   More particularly, the PJM market is based on the demand of retail electricity customers (residential, business and government) as calculated by PJM and load serving entities (LSE).[1]  In order to serve the consumers, the LSEs purchase capacity and energy from PJM through the PJM interstate grids, and PJM is paid the capacity price.  Generators sell their energy and capacity to PJM. The generators have no idea which LSE used the energy produced. As explained at oral argument "you just put it (energy) into PJM and the electrons go wherever and nobody traces them, the same thing is true with capacity." (T. 31, 19-21)[2].

   In order to determine the price of wholesale electric capacity, PJM conducts a base rate capacity auction (sometimes referred to as BRA herein) using the "reliability pricing model" (RPM). Under this model, the LSEs and generators buy and sell capacity three years in advance at the lowest

---

   [1]   It is unclear how many plaintiffs are LSEs, but there are at least two, PSE&G and Atlantic City Electric.

   [2]   Mr. Kleinman, attorney for Defendant CPV Power Development, acknowledged that if the LCAPP Act developed generators, only "some" of the energy produced would be returned to New Jersey in the event of a transmission failure. The point is no one knows where the energy is utilized.

competitive price.

In PJM capacity auctions, demand for capacity is determined by the amount of electricity LSEs are expected to require in three years. The supply of capacity is determined by the bids of electric generators, with each generator bidding an amount of capacity it is willing to sell at the price it bids. The price of capacity is set by the intersection of supply and demand and is referred to as the "clearing price."  That is, any generator that bids at or below the clearing price "clears" the auction and receives the clearing price for its capacity.  Any generator that bids above the clearing price fails to "clear" the auction, and its capacity does not sell in the auction.  The determination of whether generators were above the clearing price is established by PJM and is called the MOPR screen (minimum offer price rule).  A generator must clear the MOPR screen in order to enter the auction where wholesale energy capacity is sold.  Once the capacity is sold to PJM, and hypothetically PJM does not need a generator's capacity, the generator "still get[s] the price for having your plant standing by ready to go." (T. 31, 1-2)

After the auction occurs, then PJM submits its wholesale electric capacity price to FERC for approval as part of  its tariff.  For the most part, over the years FERC has approved the auction process and implementation of the RPM model as an appropriate tool to determine wholesale capacity price.

Although RPM, on its face, appears to be a simple point where price meets demand, it is more complex in that there are some variables or scenarios which may impact the process.  One variable is that many generation plants are very old and/or antiquated and may be out of service. Apparently, the BPU has determined that such an event may likely happen, and New Jersey residents are at risk that shortages and outages could occur.  Since 2007,  the BPU implored PJM and FERC

to change the way the auctions are conducted. As the BPU sees it, the auction price does not allow for new generation to be created because development costs can not be recouped at auction due to the MOPR screen. According to the BPU, this occurs because PJM is too inflexible, and it will not adjust the MOPR screen to factor in new development construction costs. If an unforeseen repair or upgrade becomes necessary to any one of the antiquated or old generation plants, the capacity purchased may not be available, and another generator must produce more energy. As a result, more energy must come to New Jersey from another generator, and there may be insufficient transmission equipment to convey the energy to an LSE in New Jersey. According to the BPU, such circumstances are not adequately addressed through the PJM auction, because the best method to resolve the issue is through the creation of new, more local, generators.

The lack of transmission facilities is a concern of the BPU, for which there is factual support. In a hearing before the BPU, several PJM or PSE&G representatives testified about the lack of transmission facilities. *See*, *PSE&G application for Susquehanna-Roseland Transmission Line*, BPU Docket No. EM 9010035. Esam A. F. Khadr, Director – Electric Delivery Planning of PSE&G reviewed PJM's planning studies. Mr. Khadr agreed with PJM's finding that overloaded circuits delivering energy to New Jersey beginning in 2012 would require PJM and the transmission facility owners to "reduce transmission system voltages (brown-outs) or implement rolling black-outs for network transmission service customers." *Id.* at p. 10. In addition, Mr. Herling, Vice President of Planning for PJM prepared annual reports "to analyze the electric supply needs of customers." *Id.* at 12 (this report is abbreviated RTEP). In the 2007 RTEP, there were 23 violations identified to occur to PSE&G customers. *Id* at 13. Violations are various deficiencies in service and reliability. These violations are based on a "five-year and fifteen-year baseline analysis to assess compliance

5

with reliability criteria.  *Id*.  Reliability refers to the delivery of electricity to customers in the amounts desired and within acceptability standards for frequency, duration and magnitude of outages and other adverse conditions or events . *Id*. at 14.  Mr. Herling noted that "the PJM transmission system is rapidly reaching the point where short term incremental fixes will no longer be sufficient to mitigate identified reliability criteria violations." *Id*. at 13.  These reliability findings were known since at least 2007.  As a result, the BPU is concerned about whether sufficient energy will be delivered to New Jersey residents, and whether New Jersey utilities could obtain regulatory approval for construction of new transmission facilities if needed in the future.  To resolve these predicaments, the BPU focused on construction of new generators whereby transmission infrastructure needs could be met, and not overburdened. The BPU posits that New Jersey's best course of action is to permit new development of local generation rather than struggling with transmission issues in the future. As Mr. Kleinman stated, the LCAPP Act was enacted so that New Jersey has a "predictable stream and be able to build a power plant in the State of New Jersey, which we may need if the next hurricane, the next thunderstorm, the next forest fire, the next whatever, knocks down transmission." (T. 38, 23 through T. 39, 1).  The financial predicament that occurs with the BPU analysis is that new generators must finance construction costs in the amount of tens of millions of dollars. To do so, new generators can not clear the MOPR screen because their price is too high compared to older generators who do not have such finance costs. At the present time, most financial institutions will not finance new generators in New Jersey if the MOPR screen blocks new generation from competing with the other generators at the auction.  PJM disagrees with the BPU assessment and argues that its auction and rules have incorporated changes which allow new generators to clear the MOPR screen when the demand exceeds capacity – but that has not yet occurred.  On the other

hand, the BPU contends that as time passes, and obsolescence of older generators increases, PJM's inaction to update generation capability will become apparent.

As noted above, the State of New Jersey and the BPU became leery about meeting energy demands of the future without relief from PJM or FERC due to the lack of transmission issues, and enacted the LCAPP Act in order to overcome that issue through the development of more local generation.  On January 28, 2011, the New Jersey legislature enacted the LCAPP Act to foster new electric generation, and to provide New Jersey with new generation capacity.  The LCAPP Act has several purposes.  It requires a competitive selection process to foster the development of 2,000 MW of new base load or mid-merit electric power generation facilities in order to "ensure sufficient generation is available to the region, and thus to the users in the State in a timely and orderly manner." N.J.S.A. §48:3-98.2(d).  In addition, the statute authorized the "BPU to order New Jersey's public utilities to enter into long-term financial agreements with new generators selected by the BPU from its competitive solicitation process. N.J.S.A. 48:3-98.2 *et seq.*  The law works as follows: First, the BPU selects a limited number of electric generation companies for entry into a pilot program[3]. The BPU bases its selections on criteria included in the Act.  Second, these electric generation companies enter into irrevocable, long-term contracts with each of New Jersey's electric public utilities.  These contracts, or standard offer capacity agreements ("SOCAs"), guarantee the state-selected electric generation companies a fixed price for electric capacity.  In exchange for the price guarantee, the LCAPP Act requires the state-selected generation companies to sell their capacity at PJM auctions.  The SOCA operates to insulate the state-selected generation companies from losses

---

[3]       The use of the term "pilot program" kindles notions that the State of New Jersey may consider the development of more generators if the pilot program works.  Neither party has indicated that, and nothing herein speaks to that proposition.

at the PJM auction who bid below the MOPR screen.  Additionally, the utilities are also allegedly insulated from losses because any SOCA payment may be passed onto the New Jersey ratepayers through future rate increases.

Under the SOCA, a new generator is compelled to bid at the PJM auction "at the lowest commercially reasonable price under the RPM rules," i.e. clear the MOPR screen.  Evidently, the SOCA sets the minimum floor capacity price, and thereafter the utilities must pay the difference between the PJM auction price and the new generator's actual costs for any applicable delivery year.

Under the LCAPP Act, LSE's (utilities) and new generators entered into SOCAs earlier this year, and each LSE signed same under protest[4]. In May, 2012, PJM held an auction in which two SOCA generators cleared the MOPR screen and bid at auction. The PJM auction price was $167.00 per megawatt/day. Under the SOCA, one selected generator will receive a guaranteed fixed price of $286.00 in its first year of operation under the SOCA (T. 13, 17-22).  The difference is $119.00 (T. 24, 11-17).  In addition to present SOCA payments, the guaranteed price steadily increases each year of the 15-year contract, topping off at $432.65 in the final year.  Although the LCAPP Act anticipates the costs of SOCA contracts will be passed on to the utilities' ratepayer customers, the BPU acknowledges that there is no guarantee that the utilities will recover the full costs.

At oral argument, the Plaintiffs focused their presentation on wholesale capacity pricing as the main area of preempted activity; but there are other aspects of pricing over which the BPU has control and which should be mentioned.  In addition to the wholesale capacity price, the BPU regulates other components of the price that consumers pay for electricity.  According to Mr.

---

[4]     The Court is uncertain what the term "under protest" means; but to the extent SOCA's are referred to as agreements, it is questionable whether there was a meeting of the minds.

Kleinman, "the utility is guaranteed that it will get from its consumers in the rates, what it needs to meet its obligations in the wholesale markets.." (T. 33, 3-7).  Included in electric rates are the PJM cost (T. 33, 8), wires and connections (T. 33, 18), electrons (energy usage) (T. 33,22) and contract for differences (T. 34,1)  The BPU considers all of these costs when it approves rates. The SOCA contract falls within the last category (T. 34, 6).

On November 17, 2011, FERC held hearings to review the PJM auction procedure and to determine whether any charges were required in light of the LCAPP Act. Many generators believed the LCAPP Act would undermine the competitiveness of the auction, and they requested the hearing. In light of same, FERC made some changes so that the competitiveness of the auction remained robust, displeasing the BPU. FERC concluded in paragraph 206:

> 206. We also reject the New Jersey Rate Counsel argument that the Commission lacks jurisdiction to subject new self-supply to a mitigated price determination that may prevent the resource from being used to satisfy a load serving entity's capacity. As pointed out with respect to the state exemption, the Commission is not infringing on the sovereignty of the state, but is merely regulating the wholesale prices charged in the capacity market. Load serving entities are free to contract with any generator they choose to supply power. The MOPR affects only the price that such a generator will be permitted to bid into the capacity market, which may affect the ultimate wholesale price to be paid to all resources, including generation, demand response, and energy efficiency.

*See PJM Interconnection, L.L.C. PJM Power Providers Group v. PJM Interconnection, L.L.C.*, 2011 WL 5895396 (FERC).  The adversity and tension between the BPU and FERC is shown within the quoted paragraph as they quarrel over whose action should take precedence when determining whether a competitive market (federal concern) or the planning for sufficient supply of generation (state concern) are at issue.

II.

The issue presented is whether the LCAPP Act is void due to the doctrine of preemption. Preemption arises when a state "is deprived of their power to act" because "it is in direct conflict with federal law." *O'Reilly*, *Federal Preemption of State and Local Law*, American Bar Association, p. 1 (2006). The preemption doctrine is rooted in the Supremacy Clause of the United States Constitution. *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992). It states:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.

U.S. Const. Art. VI, cl. 2.

In other words, preemption concerns the allocation of power between state and federal action, that is, whether state law conflicts with valid federal law. *City Of Charleston, South Carolina v. A Fisherman's Best, Inc.*, 310 F. 3d 155, 168 (4th Cir. 2002). Federal law that raises preemption may be the Constitution itself or a valid Act of Congress. *Id.* at 168-69. Regulations of a federal agency may have the same effect. *Id.* "The ultimate touchstone of preemption analysis is the intent of Congress." *Id*. at 169. The issue is not whether the Court favors a particular state or federal policy, but rather, the Court must determine whether the state action (enactment of the LCAPP Act), "interferes with or is contrary to the laws of Congress . . ." *Id*. at 169, citing *Wisconsin Pub. Intervenor v. Mortier,* 501 U.S. 597, 604, 111 S.Ct. 2476, 115 L.Ed.2d 532 (1991). As Justice Blackmun summed up the law:

> The circumstances in which federal law pre-empts state regulation are familiar. A pre-emption question requires an examination of congressional intent. Of course, Congress explicitly may define the extent to which its enactments pre-empt state law.  In the absence of explicit statutory language, however, Congress implicitly may indicate an intent to occupy a given field to the exclusion of state law. Such a purpose properly may be inferred where the pervasiveness of the federal regulation precludes supplementation by the States, where the federal interest in the field is sufficiently dominant, or where "the object sought to be obtained by the federal law and the character of obligations imposed by it . . . reveal the same purpose." Finally, even where Congress has not entirely displaced state regulation in a particular field, state law is pre-empted when it actually conflicts with federal law. Such a conflict will be found "'when it is impossible to comply with both state and federal law, Florida Lime & Avocado Growers, Inc. v. Paul, 373 U. S. 132, 142-143 (1963), or where the state law stands  as an obstacle to the accomplishment of the full purposes and objectives of Congress, Hines v. Davidowitz, 312 U. S. 52, 67 (1941).'"

*Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 299 (U.S. 1988) (citations omitted).

Here, the LCAPP Act is alleged to be in conflict with PJM's auction of wholesale capacity. That is, the LCAPP Act requires the SOCA generators to bid the lowest commercially reasonable price when utilities are reimbursing SOCA generators through the terms of the SOCA.  In turn, the SOCA requires utilities to pay the difference between the PJM price and the gas powered generators' actual costs, if any.  As a result, the question is whether the LCAPP Act, which allows the SOCA generator to bid below cost due to SOCA reimbursement, artificially lowers auction prices, defeating federal competitiveness concerns.

Plaintiffs allege that the LCAPP Act is preempted because it (1) intrudes on FERC's exclusive jurisdiction to regulate wholesale electricity transactions (field preemption), and (2) erects obstacles to the FERC's achievement of its regulatory goals in the wholesale electricity markets

(conflict preemption). <u>Complaint</u>, ¶¶ 88-89. "Under the Supremacy Clause, federal law may supersede state law in several different ways." *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985). Generally it is subdivided into express or implied preemption. According to Plaintiffs, the primary issue revolves around a subcategory of implied preemption known as field preemption. Despite Plaintiffs' contention, preemption is often difficult to characterize, and the different categories of preemption are not "rigidly distinct". *N.E. Hub Partners, L.P. v. CNG Transmission Corporation*, 239 F. 3d 333, 348 (3d Cir. 2001). *See e.g., Chamber of Commerce v. Brown*, 554 U.S. 60 (2008) (field preemption); *Nash v. Florida Indus. Comm'n*, 389 U.S. 235 (1967). Field preemption and conflict preemption involve similar, but not identical, inquiries. Field preemption exists when either "the nature of the regulated subject matter permits no other conclusion," or when "Congress has unmistakably so ordained." *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963). Conflict preemption exists when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Either finding requires a determination of the record and context of the challenged state and federal laws. *See e.g., Pacific Gas & Elec. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-23 (1983); *Perez v. Campbell*, 402 U.S. 637, 644-48 (1971).

Regarding preemption, both Plaintiffs and Defendants agree that Congress, by enacting the Federal Power Act, delegated exclusive authority to FERC concerning regulation of the transmission and sale at wholesale of electric energy in interstate commerce. The open question is whether the LCAPP Act intrudes on the FERC's exclusive authority, or if it is an obstacle to achieving federal objectives. In evaluating such situations, the Court must consider a number of factors. Professor

O'Reilly enumerated the factors, as:

    a.       Is this a traditional area of authority exercised by the federal government?

    b.       Has congress expressed an intent that federal law be exclusive?

    c.       Is there an important traditional state interest served?

    d.       Do the state regulations interfere with comprehensive federal regulatory authority? and

    e.       Is the state regulation an obstacle to a federal goal, or what aspects of the state law directly conflict with or frustrate the accomplishment of the federal statutory objectives?

See *O'Reilly*, p. 65-75.  In considering these factors, the ultimate goal is to determine Congress's intent on whether Congress sought to preempt all state action.  Reviewing the factors lends some, but not conclusive, insight as to the issue.

    A.    <u>Is there a traditional area of authority exercised by the federal government?</u>

Congress granted federal authority to FERC to regulate wholesale energy capacity.  The Federal Power Act reads "federal regulation of matters relating to generation to the extent provided in this subchapter and subchapter III of this chapter and of that part of such business which consists of the transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce is necessary in the public interest . . ."  16 U.S.C. § 824(a).  Since enactment of the Federal Power Act, FERC has exercised control of pricing of wholesale energy capacity.

    B.    <u>Has Congress expressed an intent that Federal law be exclusive?</u>

Congress has never declared that the federal government would be the exclusive regulator of the transmission of electric energy. The Federal Power Act limits federal authority "to extend only to those matters which are not subject to regulation by the States." 16 U.S.C. § 824.  Here, one of

those areas is state regulation of planning and/or generation of energy to supply to meet the needs of New Jersey residents.  Although Plaintiffs seek to limit this matter to pricing, there is a concomitant power to make certain there is a sufficient supply of energy for New Jersey residents[5]. It appears to be a right reserved to the State in many instances.

      C.     <u>Is there an important traditional State interest being served?</u>

For years, the New Jersey legislature delegated to the BPU authority over "all services necessary for the transmission and distribution of electricity . . . including but not limited to safety, reliability . . . shall remain the jurisdiction of the BPU.  The BPU shall also maintain the necessary jurisdiction with regard to the production of electricity . . . to assure the reliability of electricity . . . supply to retail customers in the State."  N.J.S.A. 48:2-13(d).  The declaration of state policy was most likely (in some form) operative at the time of enactment of the Federal Power Act. There is little or nothing in the Federal Power Act which required the state to relinquish any of its authority over the planning or generation of a sufficient supply of electricity to either FERC or PJM. Moreover, the BPU's rationale to act is somewhat understandable in light of the statements made by PJM officials at the BPU hearing in 2007 indicating that brownouts or blackouts may result due to transmission failures by the year 2012.  Although PJM's and FERC's position has changed about such violations of reliability for various reasons, the BPU's position has not. Here, there may be an important state interest similar to the regulation of production of gas.  *See Northwest Central Pipeline Corporation v. State Corporation Commission of Kansas,* 489 U.S. 493 (1989).

---

[5]     In addition, (and the record is not clear) PJM may consider itself as chief of planning/generation through the wholesale energy auction.  My review of federal and state statutes does not show that regulation of planning is delegated to PJM. The issue has not been briefed.

In addition to the long term power of BPU to regulate generation planning, it also has some authority in setting the price of energy. Although PJM may set wholesale capacity price by an annual auction. The second part of the costs are set by the BPU. These costs include but are not limited to "wires and interconnections," and contracts for alternatives (SOCA). Hence, when it comes to pricing, federal and state regulators in some ways share or have concurrent authority.

The Plaintiffs argue that the doctrine of field preemption applies. "Field preemption may occur when the federal scheme of regulation of a defined field is so persuasive that Congress must have intended to have no room in that field for the state to supplement it with their own rules." *O'Reilly* at p. 70. Plaintiffs argue field preemption applies due to a federal statutory mandate for a wholesale capacity auction. *See Pacific Gas v. State Energy Resources Conserv. & Dev. Comm'n*, 461 U.S. 190 (1983). *See also N.E. Hub Partners, L.P. v. CNG Transmission Corporation*, 239 F. 3d 333 (3d Cir. 2001). It appears to the Court, from looking at the powers vested with FERC and with those vested in the BPU, that both have the authority to act in a manner to carry out their responsibilities to the ratepayers.

In *N.E. Hub*, FERC issued a certificate of public convenience for the construction of a natural gas storage facility in which it examined "numerous technical, safety, and environmental issues." *Id*. at 336. Pennsylvania authorities sought to revisit the issues considered by FERC. Evidently, FERC had reviewed about thirty separate issues over a long period of time concerning the construction process. Due to Pennsylvania's rehashing of FERC's previously decided issues, N.E. Hub filed suit requesting declaratory judgment that the Natural Gas Act preempted Pennsylvania's review process. One of the issues was whether the state regulatory process is susceptible of preemption by conflict or by field occupation. *Id*. at 346. That issue was remanded for review to the

15

District Court.  The Third Circuit noted:

> different categories of preemption are not rigidly distinct.  Indeed,
> field pre-emption may be understood as a species of conflict
> pre-emption: A state law that falls within a pre-empted field conflicts
> with Congress' intent (either express or plainly implied) to exclude
> state regulation.

*Id*. at 348 (quoting *English v. General Elec. Co.*, 496 U.S. 72, 79 n. 5, 110 S.Ct. 2270, 2275 n. 5, 110 L.Ed.2d 65 (1990).  As Judge Greenberg noted, "our ultimate task in any pre-emption case is to determine whether state regulation is consistent with the structure and purpose of the statute as a whole."  *N.E. Hub.* at 348, quoting *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88 (1992).  For certain, "the dichotomy between the two types of preemption [conflict and field] is not so sharp in practical terms as the legal categorization makes it appear...." *Id.*  This lack of sharpness arises here.  In *N.E. Hub*, there were thirty substantive issues decided by FERC through its review process which illustrate the comprehensive nature of FERC's dominion over the construction process. In contrast, here there is one annual auction of wholesale capacity by PJM with FERC's approval of a tariff, and there are a host of other regulatory matters handled by the BPU on a daily basis including planning of generation supply.  As a result, *N.E. Hub* is similar since it was remanded to District Court so it could find the legitimate balance of state/federal authority in the construction process.

      D.     Do the state regulations interfere with comprehensive federal regulatory authority and <u>Is the State Regulation an Obstacle to Reaching a Federal Goal?</u>

Here, the use of the word "obstacle" raises issues of fact. Generally, summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a

matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  Here, where there are three motions for summary judgment, and the parties dispute the facts of whether the LCAPP Act is an obstacle to a competitive auction.

Here, the facts determining what constitutes an obstacle required careful consideration.  Some of the facts are disputed, and some other facts are derived from the opinions of experts whose conclusions have not been subject to cross-examination. The disputed facts are contained within Defendants' Statement of Material Facts (ECF No. 100-1), and Plaintiffs' Statement of Material Facts Precluding Judgment  (ECF 124-1). Since there are disputed facts in determining whether an obstacle exists, summary judgment is inappropriate.  Several examples of disputed facts are set forth below:

\*        <u>Compare</u> Paragraph 7 of Plaintiff statement which concludes "the LCAPP Act will suppress energy prices by more than $1.5 billion (ECF 124-1) <u>with</u> Paragraph 20 of defendants' statement which concludes "Assuming that the SOCA units engage the FERC-authorized MOPR exception process, their capacity could clear the BRA in a manner that has no adverse effect upon the competitive price produced by the auction."  (ECF 100-1).

\*        <u>Compare</u> Paragraph 8 of Plaintiffs' statement which declares that "The actual effects of the LCAPP Act have already begun to distort the PJM energy and capacity market, thus interfering with FERC's market-based-rate policies. The LCAPP Act influenced Calpine's decision to forego new generation at its Edgemoor, Delaware facility" (ECF 124-1, para. 8) <u>with</u> Paragraph 17 of Defendants' statement where it asserts in pertinent part:

> The treatment of SOCA capacity will therefore be identical to the treatment afforded all other new generation capacity offered into the BRA (base rate auction), with no distinction between state-sponsored and privately developed generation capacity.

\*      <u>Compare</u> Paragraph 12 of Plaintiffs' statement wherein it claims: "the MOPR screen applies only until the generator clears one auction, after which the screen is removed entirely" <u>with</u> Paragraph 16 of Defendants' statement which asserts "this price mitigation will now subject SOCA capacity to the prospect of <u>not clearing</u> the BRA, since the increased mitigated price could likely <u>exceed</u> the BRA <u>clearing price</u>." And again in paragraph 20, when discussing "the unit-specific exception process" within the BRA it states "the generator could offer into the BRA and <u>clear, or not clear</u>, depending upon the final resource clearing price emerging from the auction". (emphasis added).  At any rate, how the MOPR screen actually works is an important issue to clarify; despite the fact that the evidence presented is contradictory. A factual dispute is genuine if it would affect the outcome of the suit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Here all three of the above facts could affect the outcome, i.e. any one of the facts could represent an obstacle.

In addition to the above questions of fact, there are also the opinions of experts which must be evaluated on the basis of credibility and reliability. For instance, in paragraphs 9 and 10 of Plaintiffs' Statement of Material Facts (ECF 124-1), the testimony of Mr. Cregg is relied upon.  He states:

> The LCAPP Act was a very important factor in PS Power's decision-making regarding its investments in units in PJM and that "we had a much worse market construct given LCAPP than not having LCAPP," and "current market signals suggest that it was uneconomical to build generation in New Jersey before LCAPP . . . and the LCAPP Act made this situation worse.

18

Mr. Cregg's conclusion is broad, and any conscientious trier of fact must assess the scope of Mr. Cregg's statement to determine its trustworthiness.  To assess Mr. Cregg's statement in a summary judgment motion is inadequate.  In conclusion, there are disputed facts and a need to access the trustworthiness of expert testimony. As such, all motions for summary judgment on preemption are denied. Most notably, there is an issue of fact as to whether the LCAPP Act is an obstacle to the achievement of the federal goal of a competitive auction; and expert testimony must be thoroughly evaluated.  This is an important matter of governmental delegation of state and federal authority. The disputed facts must be resolved and the opinions of experts must be thoroughly reviewed. This is best accomplished at trial.

ORDER

For the reasons set forth in the above memorandum;

IT IS on this 28th day of September, 2012;

ORDERED that by Plaintiffs motion for summary judgment (ECF 88) is denied; and it is further

ORDERED that the Cross-Motion for Summary Judgment by CPV Power (ECF 98) is denied; and it is further

ORDERED that the motion for summary judgment by Nicholas Asselta, Joseph Fiordaliso, Jeanne Fox and Lee Solomon (the Board of Public Utilities) (ECF No. 100) is denied.

*s/Peter G. Sheridan*
PETER G. SHERIDAN,  U.S.D.J.